```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 23, 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
E.ON US CORPORATION,                    :
                                        :
                        Plaintiff,      :
                                        :
            -v-                         :          14 Civ. 2701 (KBF)
                                        :
PPL CORPORATION,                        :          OPINION & ORDER
                                        :
                        Defendant.      :
--------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

        This is a breach of contract action arising from the $7.6 billion sale of E.ON

U.S. LLC, successor by merger to E.ON US Investments Corporation ("EUSIC"), to

PPL Corporation ("PPL").[1]  The parties have filed what are essentially mirror

claims against each other regarding certain post-closing tax adjustments that

EUSIC claims pursuant to the Purchase and Sale Agreement ("PSA" of

"Agreement") dated April 28, 2010.[2]  EUSIC commenced this action in April 2014;

the operative amended complaint ("Compl.") was filed on July 11, 2014.  (ECF No.

25.)  On July 31, 2014, PPL filed an answer with counterclaims ("C.Cl.") seeking a

declaration of entitlement to those categories of payment sought by EUSIC. (ECF

No. 28.)  Discovery has been completed.  Before this Court are the parties' cross-

motions for summary judgment.

---

[1] The terms "EUSIC" and "E.ON" were used somewhat interchangeably in the briefing and at oral
argument.  The Court has attempted to accurately reflect the proper party in this Opinion.  Should
the parties believe there is a mistake as to attribution, they should inform the Court.
[2] On December 1, 2014, the parties settled Count One of the Amended Complaint: EUSIC's claim for
$965,022, attributable to the Kentucky Tax Settlement.  (ECF No. 56.)  The Court assumes that the
settlement also resolves PPL's first Counterclaim regarding the Virginia and Kentucky Tax
Assessments.

EUSIC claims that it has suffered in excess of $12 million in damages as a result of PPL's refusal to pay it a $4.1 million overpayment of taxes in 2005 to the State of Kentucky ("Kentucky Tax Overpayment"), a $2.3 million tax credit generated from the purchase of recycling equipment in 1999 ("the Kentucky Recycling Credit"), and $6 million in net-operating losses ("NOLs").

PPL denies that it owes EUSIC any of these amounts, and has cross-claimed for its entitlement to what it calculates to be more than $4.48 million (plus interest, attorneys' fees and costs) relating to the same categories of items.

For the reasons set forth below, E.ON's motion for summary judgment is GRANTED in part and DENIED with respect to the NOLs, and PPL's is GRANTED with respect to the NOLs and otherwise DENIED.

## I.   BACKGROUND

The following facts are undisputed.[3]

E.ON serves as the holding company for the United States affiliates of E.ON SE, a German international power and energy utility company. (PRSOF ¶ 2.) E.ON, a Delaware corporation, is successor by merger to EUSIC. (Id. ¶ 1.)  PPL is a Pennsylvania corporation with its principal place of business in Allentown,

---

[3] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials.  (ECF Nos. 44 ("ESOF"), 49, 63, 68 ("PRSOF"), 78.)  The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible.  See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004).

Pennsylvania.  (Id. ¶ 3.)  PPL is an energy and utilities holding company that sells electricity and natural gas to customers in the United States and delivers electricity to customers in the United Kingdom. (Id. ¶ 3.)

On April 28, 2010, EUSIC and PPL entered into the Purchase and Sale Agreement ("PSA") pursuant to which EUSIC agreed to sell PPL all of the issued and outstanding limited liability company interests of EUSIC's former subsidiary, E.ON U.S. LLC. ("Transaction"). (Id. ¶¶ 4, 6.)  The Transaction closed on November 1, 2010. (Id. ¶ 4.)  Prior to the Transaction, E.ON U.S. LLC, a Kentucky limited liability company, conducted business in the regulated energy market in Kentucky through its subsidiaries Louisville Gas & Electric Company ("LG & E") and Kentucky Utilities Company ("KU").  (Id. ¶ 5.)  Following the Transaction, PPL now operates these businesses through a single subsidiary, the former E.ON U.S. LLC, which it renamed LG & E and KU Energy LLC ("LKE"). (Id.)

A.    The Relevant Provisions of the PSA

Section 6.2 provides, in relevant part:

> Effective as of the Closing Date . . . [EUSIC] shall indemnify and hold
> [PPL] harmless from and against any Losses in respect of (i) any Taxes
> imposed with respect to [E.ON U.S. LLC] or any of its own subsidiaries
> for the taxable periods, or portions thereof, ended on or before
> [December 31, 2009] . . .

(Id. ¶ 10.)  "Losses" are defined as:

> . . . losses, damages, claims, fees, fines, costs and expenses, interest, awards, settlements, Liabilities, recourses, judgments and penalties (including reasonable attorneys' fees and expenses) whether or not involving a third party claim.

(Decl. of Zelig, Ex. 12, p. 7, ECF No. 52.)

Section 6.3 provides, in relevant part:

> Effective as of the Closing Date…[PPL] shall indemnify and hold [EUSIC] harmless from and against any Losses in respect of Taxes with respect to [E.ON U.S. LLC] or any of its Subsidiaries other than those taxes for which [EUSIC] is responsible pursuant to Section 6.2.

(PRSOF ¶ 11.)

Section 6.5 provides, in relevant part:

> [EUSIC] shall prepare and file (or cause to be prepared and filed) all Tax Returns relating to [E.ON U.S. LLC] or any of its Subsidiaries which are required to be filed after the Closing Date and which are filed on a consolidated, unitary and combined basis with [EUSIC]. With respect to any Tax Return to be prepared and filed by [EUSIC]…[PPL] shall cause [E.ON U.S. LLC] to prepare and provide to [EUSIC] a package of Tax information materials…and shall include drafts of the Tax Returns (computed on a stand-alone basis with respect to the Company and its Subsidiaries), schedules and significant work papers . . .

4

(PRSOF ¶ 12.)

Section 6.6(g) provides, in relevant part:

> Each party shall pay or cause to be paid to the other party any refunds or credits of Taxes for which the other party is responsible pursuant to this Agreement (including any interest thereon paid by the applicable Governmental Authority in respect of such refund or credit) within 30 Business Days after the receipt of such refund or the realization of such credit.  Each party shall, at the reasonable request of the other party, cooperate in good faith with such other party in obtaining such refunds or credits, including through the filing of amended Tax Returns or refund claims.

(PRSOF ¶ 13.)  Both parties participated in the drafting of Section 6.6(g). (PRSOF ¶ 14.)

Section 6.7 provides:

> Tax Sharing Matters. Any tax sharing agreement or arrangement between Seller and any of its Affiliates (other than the Company and its Subsidiaries), on the one hand, and the Company and its Subsidiaries, on the other hand, including the Tax Sharing Agreement, shall be terminated as of the Closing. All amounts payable under the Tax Sharing Agreement as of the Closing shall be determined promptly after the Closing (for the avoidance of doubt, such amounts to be determined without regard to the due dates for payments otherwise

5

applicable under the Tax Sharing Agreement and without regard to

Section 7 of the Tax Sharing Agreement) and shall be settled no later

than the due date for the payment of the Tax to the relevant Tax

authority to which such amount relates.

(PRSOF ¶ 15.)

B.   Relevant Provisions of the Tax Sharing Agreement

The Amended and Restated Tax Allocation Agreement (the "Tax Sharing

Agreement") is a written agreement dated March 31, 2009, among EUSIC, E.ON

U.S. LLC and their respective subsidiaries, defined in the Tax Sharing Agreement

as the "Affiliated Group." (PRSOF ¶ 18.)[4]  Pursuant to the Tax Sharing Agreement,

EUSIC, as the parent of the Affiliated Group, was required to file consolidated

federal income tax returns on behalf of the Affiliated Group and to make all

corporate income tax payments on behalf of the Affiliated Group. (PRSOF ¶ 19.)

The Tax Sharing Agreement states:

WHEREAS, it is the intent and desire of the parties hereto that a

method be established for allocating the consolidated tax liability of

the Affiliated Group among its members, for reimbursing US Parent

[EUSIC] for payment of such tax liability, for compensating any party

for use of its losses or tax credits, and to provide for the allocation and

---

[4] The Tax Sharing Agreement amends and restates the Amended and Restated Tax Allocation
Agreement among EUSIC, E.ON U.S. LLC and their respective subsidiaries, dated as of January 2,
2006. (PRSOF ¶ 28.)

> payment of any refund or credit arising from a carryback, or
> carryforward of losses or tax credits from other tax years.

(PRSOF ¶ 21.)  Section 4 of the Tax Sharing Agreement provides, in relevant part:

> . . . US Parent (or other non-utility designee) shall pay any Member
> with a positive Corporate Tax Credit the amount of such Corporate
> Tax Credit . . . In the event that less than all of the losses, credits,
> carryovers or other tax benefits of the Members having negative
> Separate Return Tax are absorbed, the aggregate Corporate Tax
> Credit applicable to such Members shall be allocated to such Members
> in proportion to their negative separate return tax; provided, however,
> that to the extent that the Consolidated Tax and Separate Return Tax
> for any year include material items taxed at different rates or involve
> other special benefits or limitations, the associated tax benefits shall
> be first allocated, to the extent possible, to the Individual Members of
> the group applicable to them. Under no circumstances shall the
> amount of tax liability allocated to a Member of the Affiliated Group
> under this Agreement exceed its separate tax liability.

(PRSOF ¶ 22.)  The Term "Corporate Tax Credit" is defined in the Tax Sharing
Agreement as:

> the negative Separate Return Tax of a member for a taxable year,
> equal to the amount by which the Consolidated Tax is reduced by

> including a loss, credit, carryover or other tax benefit of such member
> in the consolidated return.

(PRSOF ¶ 23.)

"Corporate Taxable Income" is defined as:

> . . . the income or loss of a member, computed as though the member
> had filed a separate return on the same basis as used in the
> consolidated return…Carryovers and carrybacks shall be taken into
> account unless the member has been paid a Corporate Tax Credit
> therefore under paragraph 4 of this Agreement.

(Decl. of Zelig, Ex. 1, p. 2.)  "Separate Return Tax" is defined as:

> . . . the tax on the Corporate Taxable Income of a Member computed as
> though the Member were taxable as a corporation filing a separate tax
> return and were not a Member of a consolidated group.  For purposes
> of computing the Separate Return Tax of a Member which is a limited
> liability company, such Member shall be considered to possess and be
> entitled to use losses, carryovers, tax credits and other tax attributes
> (1) attributable to a predecessor of such Member taxable as a
> corporation or (2) arising while such Member is a limited liability
> company.

(Id.)

C.     The Kentucky Tax Overpayment

In 2005, during which E.ON U.S. LLC and its subsidiaries were still owned by EUSIC, E.ON U.S. LLC overpaid its estimated Kentucky state income taxes by approximately $4.1 million. (PRSOF ¶ 33.) The parties refer to this as the "Kentucky Tax Overpayment." When higher tax liabilities to Kentucky did not materialize in 2005, rather than apply for a refund of the overpayment, E.ON U.S. LLC chose to roll the overpayment over to the subsequent year. (PRSOF ¶ 34.) E.ON U.S. made the same choice to roll that overpayment over for each of the years 2006, 2007, 2008 and 2009, and again when the 2008 Kentucky state income tax return was amended in 2010. (PRSOF ¶ 35.)

In August 2011, following the Transaction, the LG & E tax department sent EUSIC a draft of the consolidated Kentucky state income tax return for EUSIC and its subsidiaries. (PRSOF ¶ 36.) At that time, LG & E was owned by PPL and was responsible under the PSA for preparation of this tax return. (PRSOF ¶ 36.) The draft return reflected the application of the overpayment to offset E.ON U.S. LLC and its affiliates' 2010 Kentucky state income tax liabilities. (PRSOF ¶ 37.) The parties disagreed as to whether, under the PSA, PPL was entitled to apply the overpayment to current liabilities or whether EUSIC was entitled to it. EUSIC agreed to the filing of the return but reserved its rights. (PRSOF ¶ 39.) As a result, E.ON U.S. LLC and its subsidiaries timely filed their 2010 Kentucky state income tax return; that return reflected the application of the overpayment in the amount of $4,123,359 to offset 2010 tax liabilities. (PRSOF ¶ 40.) Subsequently, the

9

Kentucky Department of Revenue audited the EUSIC group's 2009 and 2010 consolidated state tax returns. (PRSOF ¶ 41.) The overpayment was noted as a "credit" that offset the group's 2010 corrected tax liability. (PRSOF ¶ 41.)

D. <u>Kentucky Recycling Credit</u>

In 1999, one of EUSIC's subsidiaries generated a Kentucky state income tax credit in an amount in excess of $8 million as a result of its purchase of certain composting and/or recycling equipment. (PRSOF ¶ 43.) This gave rise to what is referred to in this matter as the "Kentucky Recycling Credit." Between 1999 and 2009, portions of that credit were applied to reduce Kentucky state income tax liabilities of EUSIC and its subsidiaries. (PRSOF ¶ 44.) By the end of 2009, $3,345,121 of the Kentucky Recycling Credit remained available for use. (PRSOF ¶ 45.) On the 2010 consolidated Kentucky state income tax return for EUSIC and its subsidiaries, prepared and filed by LG & E in 2011, $3,219,247 of that credit was utilized to offset income tax liabilities of E.ON U.S. LLC and its subsidiaries, leaving $125,874 available for use in the following year. (PRSOF ¶¶ 46, 47.)

A 2012 audit by the state's Department of Revenue for the 2009 and 2010 returns determined that E.ON U.S. LLC owed additional taxes for those years and that certain adjustments to the application of tax credits generated by EUSIC and its subsidiaries prior to 2009 were appropriate. (PRSOF ¶ 49.) The audit resulted in a redetermination of state tax owed for the 2009 tax year of more than $4 million and for the 2010 tax year of more than $12 million. (PRSOF ¶ 50.) In partial satisfaction of the corrected tax liability for 2009, a portion of the Kentucky

Recycling Credit, in the amount of $1,041,299 was applied. (PRSOF ¶ 51.)  A coal credit that had been previously generated by E.ON U.S. LLC, in the amount of $1,600,164, was also applied.  (PRSOF ¶ 52.)  As part of the post-closing true-up process in December 2010, PPL had paid EUISC for the right to use the coal credit. (PRSOF ¶ 52.) In partial satisfaction of the corrected tax liability for 2010, the remaining portion of the Recycling Credit, in the amount of $2,356,499, was applied. (PRSOF ¶ 53.)

     E.    NOLs

     EUSIC filed both federal and Kentucky state income tax returns as the parent of a consolidated group that included its various subsidiaries.  (PRSOF ¶ 58.) This manner of filing allowed it to offset the companies' profits and losses against one another. (PRSOF ¶ 57.)  As of December 31, 2006, EUSIC and its subsidiaries had a total of $205,707,549 in net operating losses ("NOLs") accumulated from prior years. (PRSOF ¶ 60.)[5]  After utilization of NOLs in connection with the group's 2007 tax liabilities, EUSIC and its subsidiaries had a total of $78,820,692 in NOLs remaining. (PRSOF ¶ 61.)  Of those remaining NOLs, $12,101,185 had been generated by EUSIC, $26,267,295 had been generated by E.ON North America, a subsidiary of EUSIC that was not sold to PPL as part of the Transaction, and the remaining $40,452,212 had been generated by E.ON U.S. and its subsidiaries. (PRSOF ¶ 62.)

---

[5] A net operating loss is when a company's expenses exceed its income.  (PRSOF ¶ 59.) NOLs may be utilized to offset current year income; remaining NOLs may be carried forward to be utilized in subsequent years. (PRSOF ¶ 59.)

As of December 31, 2009, EUSIC, E.ON U.S. LLC, and their respective subsidiaries had generated a total of $1,135,050,519 of NOLs. (PRSOF ¶ 65.) For the 2010 tax year, certain members of the EUSIC consolidated group were in a net profit position and certain were in a net loss position. (PRSOF ¶ 66.)  EUSIC had a current year loss of $29,202,440 for 2010, and certain subsidiaries of E.ON U.S. had current year losses of $145,666,834. (PRSOF ¶ 66.) Consolidated group income was reported as $188,912,626. (PRSOF ¶ 67.)  This taxable income was offset by a special deduction and the $188,810,188 of NOLs. (PRSOF ¶ 68.)  The net taxable income reported on the Kentucky state income tax return was offset by $22,022,226 of NOLs of EUSIC, E.ON U.S. and their respective subsidiaries. (PRSOF ¶ 69.) Consistent with applicable regulations, the oldest generated NOLs were used first to offset current year taxable income for the consolidated federal income tax return. (PRSOF ¶ 70.) Thus, $27,638,107 of the $188,810,188 in NOLs used to offset 2010 income were sourced from EUSIC's NOLs and $2,782,103 was sourced from E.ON North America's NOLs. (PRSOF ¶ 71.)

LG & E prepared the 2010 consolidated federal income tax return for EUSIC and its subsidiaries.  (PRSOF ¶ 73.) In connection with that filing, the parties disputed the proper method for allocating the $188,810,188 of NOLs used to offset the EUSIC group's taxable income.  (PRSOF ¶ 74.)

Ronald L. Miller, the Director of Tax at LG & E, send EUSIC a memorandum on May 16, 2011 explaining the method used. (PRSOF ¶ 76.)  He stated:

> . . . In general, NOLs are tracked by entity as well as on a
> consolidated basis. For example, in year 1, Entity A has $100 of
> unused NOLs. In year 2, Entity A has $200 of unused NOLs and
> Entity B has $300 of unused NOLs.  In year 3, the group has
> taxable income of $50, allowing $50 of NOLs to be used.  Our tax
> sharing agreement method would allocate the $50 based on the
> ratio of Entities A and B cumulative unused NOLs.  In this
> example, Entity A has $300 . . . of the total $600 . . . of unused
> NOLs.  Entity B also has $300 of the total of $600 of unused
> NOLs.  Both Entity A and B would be allocated $25 (50% of $50)
> of NOLs utilized.

(PRSOF ¶ 76.)  An attachment to that memorandum indicated that of the
$188,810,188 in NOLs used, he proposed to allocate the non-separate return year
limitation ("SRLY") NOLs to each member of the consolidated group based upon the
percentage that each member had of the $1,111,565,326 of cumulative non-SRLY
NOLs available as of December 31, 2009. (PRSOF ¶ 77.)  This allocation method
disregards the year in which the NOLs are generated. (PRSOF ¶ 78.) According to
Miller's calculations, of the non-SRLY NOLs utilized for the 2010 tax year, E.ON
U.S. and its subsidiaries were allocated $173,854,046, EUSIC was allocated
$12,690,242 and E.ON North America was allocated $468,064.  (PRSOF ¶ 79.)
E.ON North America was also allocated the $1,797,836 SRLY NOLs used for 2010.
(PRSOF ¶ 79.)

13

This same attachment reflects that after the utilization of NOLs for 2010, the group's cumulative NOLs were $954,582,567, with $861,843,084 allocated to E.ON U.S. and its subsidiaries, $68,738,109 was allocated to EUSIC, $2,314,017 was allocated to E.ON North America, and $21,687,357 was allocated to E.ON North America SRLY. (PRSOF ¶ 80.) The method used by Miller as reflected in the attachment to his memorandum is different from that called for by the federal tax regulations. (PRSOF ¶ 82.)

II.    APPLICABLE LAW

A.    <u>Summary Judgment Standard</u>

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  <u>Id</u>. at 322-23.  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).

14

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

B.     Applicable Contract Principles

Resolution of this action requires the application of straightforward principles of contract law. The PSA and TSA both have New York choice of law

provisions. (PRSOF ¶ 17.)  Under New York law, the meaning of contractual language is a question of law to be decided by the court.  See In re World Trade Ctr. Disaster Site Litig., 754 F.3d 114, 122 (2d Cir. 2014).  When faced with questions of contract interpretation, a Court looks to the language in the contract itself as evidencing the parties' intentions.  Cont'l Ins. Co. v. Atl. Cas. Inc. Co., 603 F.3d 169, 180.  A court may refer to parole evidence only when it finds the meaning of a term ambiguous.  World Trade Ctr. Litig., 754 F.3d at 122.  The fact that the parties may dispute the meaning of a term does not itself render language ambiguous.  See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010).  A contract is considered unambiguous when its language "provides a definite and precise meaning, unattended by the danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."  Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 99 (2d Cir. 2012) (internal citations omitted.)

In construing a contract, a court may not add or excise terms, nor otherwise make a new agreement between the parties in the guise of interpretation.  Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 13 N.Y. 3d 398, 404 (2009).

III.   DISCUSSION

A.   The Kentucky Tax Payment and Recycling Credit

EUSIC asserts that it is entitled to more than $6.4 million attributable to the combination of the Kentucky Tax Overpayment and the Kentucky Recycling Credit.

16

According to EUSIC, its entitlement is based on nothing more than the straightforward interpretation of Section 6.6(g) of the PSA.  The Court agrees.

By its terms, Section 6.6(g) requires that EUSIC and PPL pay to the other "any refunds or credits of Taxes for which the other party is responsible."  Section 6.2 provides that EUSIC is responsible for taxes imposed for taxable periods ending on or before December 31, 2009 (along with certain additional taxes imposed between January 1, 2010 and ending on the closing date of the Transaction).

The parties do not dispute that the Kentucky Tax Overpayment arises from an overpayment made during 2005.  That was plainly during the period for which EUSIC is both responsible for taxes owed, but also entitled to credits due.  That the Overpayment was applied to offset E.ON U.S. LLC's 2010 state income tax liability following the Transaction does not alter this result.  EUSIC approved the filing of the state tax return, but specifically reserved its rights to seek payment pursuant to Section 6.6(g).

It is also undisputed that the Kentucky Recycling Credit arose in 1999. Between 1999 and 2009, EUSIC and its subsidiaries used some but not all of the credit.  As of the end of 2009 – the last period for which EUSIC was responsible for the tax obligations, and the period for which it is entitled to receive credits – $3,345,121 remained available for use.  E.ON U.S. LLC used $2,356,499 to offset its (corrected) 2010 tax liability.

With regard to both the Overpayment and Recycling Credit, PPL makes several arguments.  First, they argue that the amounts at issue should be

17

considered "assets" and therefore transferred with all of the other assets to PPL when the Transaction closed.  According to PPL, it paid $7 billion for the assets it purchased and, since certain tax benefits were specifically marketed as benefits of the Transaction, these previously existing amounts should be included among all assets sold.  To reinforce its point, PPL refers in its papers to both of these disputed amounts as the "Kentucky Tax Assets".

Second, PPL argues that a determination that these amounts are owed to EUSIC would lead to a commercially unreasonable result as EUSIC's interpretation could lead to an ongoing obligation by PPL – stretching indefinitely into the future – to pay EUSIC for future utilization of tax credits / overpayments or the like.

Third, PPL argues that EUSIC misreads the PSA.  PPL argues that it used both the Overpayment and the Recycling Credit to offset 2010 tax obligations – that is, obligations for a period for which PPL is undisputedly responsible.  PPL argues that credits or refunds of Taxes must be paid to EUSIC only insofar as they relate to periods for which EUSIC is responsible.

Finally, PPL argues that EUSIC's interpretation of Section 6.6(g) is undermined by its own actions before and after the Transaction.

The last argument is easily dispensed with – and the first three can be dealt with together.  As to the last argument, this Court may not refer to extrinsic evidence unless it finds Section 6.6(g) ambiguous.  It is not ambiguous.  This is true irrespective of the fact that Mr. Miller, Director of Tax at LG & E, asserts that he would not have certified the representations and warranties in the PSA relating to

EUSIC's financial position as of April 28, 2010 had he understood that provision to lead to the result EUSIC asserts.  Mr. Miller's understanding of the provisions of the PSA is not controlling; the plain and unambiguous language of the contract is.

PPL's first three arguments fare no better.  As an overarching matter, that PPL paid approximately $7 billion in consideration for the overall transaction cannot dictate this Court's interpretation of the contract.  See Riverside S. Planning Corp., 13 N.Y. 3d at 404 ("Courts may not 'by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing'" (citation omitted)).  This Court is required, as a matter of law, to review the actual language to which the parties agreed and interpret it.  That exercise leaves no doubt that PPL signed an agreement pursuant to which it was obligated to pay EUSIC any "credits" relating to the tax periods for which it was responsible.  There is no carve out of amounts then known, there is no carve out for a scheduled list of tax credits such as the Overpayment or Recycling Credit.  Both of these – among others – were drafting options that were not pursued.  In the absence of any such carve outs, the language is plainly broad enough to cover that which EUSIC here seeks – an Overpayment, for which either it or PPL could have requested a check be written, and a Recycling Credit.  This reasoning also disposes of PPL's argument that these amounts constitute "assets" – and because assets were not scheduled, there was no obligation to schedule these.  This is creative but misguided.  In fact, in the absence of contractual language to the contrary, the Court must construe the language as it

19

reads on its face.  The lack of exclusionary language here – given the specific issues before this Court – is fatal to PPL's argument.

The breadth of the language in Section 6.6(g) does also create a potentially ongoing future obligations by PPL to pay EUSIC additional amounts which may relate to tax periods prior to 2010. But this is not particularly troublesome and the Court certainly does not view it creating commercial unreasonableness.  The parties were free to impose a time limit on any such payment obligations in their contract, but they did not.  Realistically, while tax issues (credits or obligations) may arise in the future, they are unlikely to be as open-ended as PPL suggests.  There has been no suggestion that other, unknown, tax credits may arise.  That known, existing use of tax credits may result in some additional future obligation does not itself create such a looming business uncertainty as to render the tax provisions commercially unreasonable.

PPL's argument that because it used the Overpayment and Recycling Credit against 2010, it does not trigger payment contemplated in Section 6.6(g) misreads the contract. The language of that section refers to "any refunds or credits for Taxes for which the other party is responsible pursuant to this Agreement."  The section further states that payment is required 30 days following the receipt or realization of such credit.  As discussed above, there is no doubt that EUSIC is responsible for the periods prior to 2010.  A payment obligation is triggered within 30 days of PPL's use – or realization – of any credit or refund relating to that period.  There is no other sensible way to read the provision.  Indeed, PPL's reading would render this

20

provision irrelevant and unnecessary.  PPL's construction would mean that since PPL will always be the one utilizing the credit relating to any period as it is responsible for filing tax returns, EUSIC would never be entitled to payment under this provision.  Courts are to construe contracts so as to give meaning to all provisions – not to render them irrelevant. Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 403 (1984).

The Court's interpretation of the PSA supports EUSIC's claims with regards to the Overpayment and Recycling Credit.

B.    The NOLs

EUSIC argues that it is entitled to more than $6 million, based on its use of pre-existing NOLs to offset 2010 federal and state income tax obligations. According to EUSIC, both the Tax Sharing Agreement and the PSA obligate PPL to pay for use of those NOLs.   PPL does not dispute that some compensation for NOLs is appropriate – but vigorously contests the methodology EUSIC has used to calculate the amount.  The core of the dispute revolves around whether the "first in, first out" ("FIFO") rule from the U.S. Treasury regulations is applicable.  EUSIC argues that it is, and PPL argues that it is not.

Section 6.7 of the PSA, relating to Tax Sharing Matters, provides that the Tax Sharing Agreement "shall be terminated as of the Closing."  It also provides, "All amounts payable under the Tax Sharing Agreement as of the Closing shall be determined promptly after the Closing."  EUSIC argues that post-closing use of NOLs reduced the company's consolidated 2010 state and federal tax liability.

21

The parties agree that the definitions of "Corporate Tax Credit," "Separate Return Tax," and "Corporate Taxable Income" together provide the method for determining the appropriate amount of NOLs here at issue. They disagree as to how those definitions should be construed.

Calculating a member's Corporate Tax Credit requires (1) determining the member's "Corporate Taxable Income", (2) multiplying  "Corporate Taxable Income" by the applicable tax rate to determine a "Separate Return Tax," and, (3) if the Separate Return Tax is a negative number (e.g. no tax would be due if calculated on a standalone basis, but rather the member would be entitled to a tax credit or refund), the member is entitled to a "Corporate Tax Credit."  If more than one member has a negative "Separate Return Tax," then the final step is to allocate the aggregate Corporate Tax Credit "in proportion to [each member's] negative separate return tax."  (ESOF ¶ 22.)

EUSIC argues that the definition of "Corporate Taxable Income" requires that the tax position of the member be calculated as if it were not part of a consolidated group, thereby implicating the FIFO rule.  EUSIC supports this argument with reference to the "except that" provision.  In pertinent part, the definition provides that Corporate Taxable Income shall be "computed as though the member had filed a separate return on the same basis as used in the consolidated return, <u>except that</u> dividends or distributions from members shall be disregarded, and other intercompany transactions eliminated in the consolidated return shall be given appropriate effect."  (PRSOF ¶ 25.) (Emphasis added.)

22

According to EUSIC, the "except that" clause is plainly intended to return the member to a standalone position.

PPL argues that nothing in this definition provides that <u>the FIFO regulation</u> should be imported from the U.S. Treasury regulations. PPL relies first on the fact (which is uncontested) that the Tax Sharing Agreement does not specifically refer to the U.S. Treasury regulations. This argument alone is not enough. As set forth above, the definitions in that agreement clearly provide for calculation of a Separate Return Tax as if the member was filing as a standalone entity and not part of a consolidated group.

However, PPL also argues that Mr. Miller's historical practice is consistent with its interpretation and not with EUSIC's – and that to interpret the provision as EUSIC suggests would be to break with that historical practice. This point is ultimately persuasive. EUSIC has not contested Mr. Miller's statements regarding past practice. Rather, its argument is based on an assumption of unambiguous contract language. In fact, the Tax Sharing Agreement is silent as to whether treatment of the NOLs should occur differently when calculated as part of a Separate Return Tax than when as part of the consolidated group. The "except that" language to which EUSIC refers relates to specific items – dividends, distributions and intercompany transactions. The drafters understood how to carve out specific items when they wanted to.

It is clear that the use of NOLs are not dividends in the typical use of the word. The question is whether the use and treatment of the NOLs constitutes

either a form of "distributions" or "intercompany transactions."  Distributions are typically considered a specific amount or sum transferred or distributed between two entities.  Here, the use of NOLs does not follow such a format.  Rather, the use is proportionate and done as a total group.  Similarly, the use of NOLs is not a typical "intercompany transaction".  While their use certainly relates to intercompany operating losses, NOLs are not typically considered a "transaction."  Thus, the "except that" clause is ambiguous as to how NOLs are dealt with when calculating a Separate Return Tax.  As such, the Court refers to parole evidence and to the uncontradicted statements of Mr. Miller.  His statements leave no doubt that historically, the use and treatment of NOLs did not change when calculating a Separate Return Tax; the FIFO rule was not used.

The Court credits Mr. Miller's statements of historical methodology and uses them to provide the correct methodology here.  Accordingly, PPL is correct that EUSIC is not entitled to further NOLs in the manner claimed in Count Three.[6]

IV.   CONCLUSION

For the reasons set forth above, E.ON's motion for summary judgment is GRANTED in part and DENIED with respect to the NOLs, and PPL's is GRANTED with respect to the NOLs and otherwise DENIED.  The parties are to confer on a calculation of damages consistent with this Opinion and Order, and the Stipulation

---

[6] PPL also argues that EUSIC's claim for PPL's use of NOLs to offset state (Kentucky) tax liability is untimely.  EUSIC has proffered evidence that it asserted its right to payment in 2012.  EUSIC's Count Three – relating to the NOLs – is sufficiently broad to encompass such a claim, but the result is as set forth above – the FIFO rule is not implicated.

and Order of December 1, 2014.  They shall submit the calculation to the Court

within 14 days.

      The Clerk of the Court is directed to terminate the motions at ECF Nos. 43

and 47 and to terminate this action.

      SO ORDERED.

Dated:      New York, New York
             June 23, 2015

                              _____
                                KATHERINE B. FORREST
                                United States District Judge